William CULKIN, Appellant,

v.

James D. PURKETT; Jeremiah Nixon, Attorney General, Appellees.

No. 94–2195.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1994.

Decided Jan. 26, 1995.

Rehearing Denied March 7, 1995.

Adam J. Sipple, Clayton, MO, for appellant.

Frank A. Jung, Jefferson City, MO, for appellee.

Before BOWMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and LOKEN, Circuit Judge.

BOWMAN, Circuit Judge.

William Culkin appeals from the judgment of the District Court [1] dismissing his petition for 28 U.S.C. § 2254 (1988) habeas corpus relief. We affirm.

## I.

In 1987, Culkin was convicted by a jury in a Missouri court of two counts of sodomy and one count of rape against his ten-year-old niece, and he was sentenced to two concurrent twelve-year terms on the sodomy convictions and a consecutive twelve-year term on the rape conviction. On direct appeal, the Missouri Court of Appeals in May 1989 affirmed the judgment of the trial court. Ten days later, the victim, B.J.B., signed an affidavit stating that she had lied in her trial testimony, and that Culkin was not the person who had assaulted her. B.J.B. neither denied that she had been sexually assaulted (indeed, there was medical evidence presented at trial that she had been sexually assaulted, both in the past and recently) nor did she name the perpetrator. The Missouri Court of Appeals, before acting on motions for rehearing or transfer, granted Culkin's motion for remand to the trial court for any necessary hearing on the alleged "newly discovered evidence." Upon remand Culkin moved for a new trial.

Between the time of the remand and the date of the hearing on Culkin's motion for a new trial, an investigator, acting at the direction of the county prosecutor, travelled to Kentucky, where B.J.B. and her mother, Sandra Rundles, lived. The investigator spoke with B.J.B. and her mother in a con-

---

1. The Honorable Edward L. Filippine, Chief Judge, United States District Court for the Eastern District of Missouri, adopting the report and recommendation of the Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri.

versation (part of which was recorded) wherein Rundles admitted that B.J.B.'s affidavit, together with one that Rundles had signed supporting the recantation, were untrue and were an attempt to restore family harmony (Culkin's wife being Rundles's sister). The investigator warned Rundles and B.J.B. that, if B.J.B. were to testify under oath to the effect of the information in her affidavit, she could be charged with and prosecuted for perjury, a serious offense. He also explained that travel to St. Louis in order to testify would be required. Rundles apparently had believed that the affidavits would be sufficient for B.J.B. to recant her trial testimony.

Rundles and B.J.B. did travel to St. Louis for the hearing on Culkin's motion for a new trial. B.J.B. was called to testify, but before she did so the court advised her of the consequences of perjury and told her that he had a public defender standing by with whom she could consult if she wished. The exchange went as follows:

> The court: [B.J.B.], I know that this whole proceeding has been very painful to you and I don't want to add to the burden that you're carrying but I have to advise you, it is my duty to advise you that there are penalties for perjury, even for juveniles.
>
> Your decision in whether to testify in this matter or how to testify is your decision but I want to advise you that what you say is going to be taken down and could be used against you and if you want to consult with a lawyer before you testify, I've been advised by the Public Defender's Office that they will provide a lawyer for you to consult with if you wish. So are you, what's your desire?
>
> B.J.B.: Would I need one?
>
> The court: Well, that's something that I can't, I don't know whether you will need one, all I can tell you is that you have testified under oath at the trial in this case and you have now filed a paper, an affidavit indicating that you did not tell the truth at the trial and if you repeat that statement here today, the Circuit Attorney has the authority to seek to take proceedings against you in the Juvenile Division of this

Court. So if you want to talk to a lawyer before you testify—

> Ms. Rundles, why don't you come forward for a minute. I don't know if you have talked to your mother about testifying here today but, Ms. Rundles, have you and [B.J.B.] talked about whether she should consult a lawyer before she testifies?
>
> Rundles: We have never thought about it.
>
> The court: Well, do you want to consult with a lawyer before [B.J.B.] testifies?
>
> Rundles: Do you feel you want to?
>
> B.J.B.: I don't know.
>
> The court: I want you both to understand that there is a risk and it's my duty to advise you that you do not have to say anything if you feel that it might incriminate you in any way, and perjury is a serious offense, even as a juvenile, Ms. Rundles, so Mr. Moss [the county prosecutor] has already advised you of the possible consequences.
>
> Rundles: Yes.
>
> The court: So do you want to talk to [B.J.B.] for a few minutes privately?
>
> Rundles: How do you feel?
>
> I believe she can do it. She'll be all right.
>
> The court: [B.J.B.], do you want to go ahead without a lawyer?
>
> B.J.B.: I guess.
>
> The court: Well, if you're in any doubt then I think it would be desirable for you two to talk to a lawyer before you testify, [B.J.B.]. I'm not trying to scare you but it's, I have to protect your rights, so that's why I'm saying this, because I have a duty to protect you and to be sure that you're fairly treated but I can't be your lawyer so I think if you're in any doubt then I think perhaps you should consult with counsel.

Supplemental Transcript at 47–49.

The court recessed in order for B.J.B. and Rundles to consult with counsel. When they returned to open court, the public defender the court had appointed to represent B.J.B. advised the court on the record that, if B.J.B. were asked to testify about whether Culkin had committed the assaults for which he had been convicted, she would invoke her Fifth Amendment rights against self-incrimination

and would not answer any questions concerning the matter. The court refused Culkin's efforts to compel B.J.B.'s testimony and denied the motion for a new trial. The judgment of the trial court was affirmed on appeal. *State v. Culkin,* 791 S.W.2d 803 (Mo. Ct.App.1990).

■ After exhausting his state court remedies, Culkin filed his § 2254 petition in the District Court, it was dismissed, and he now appeals. On appeal Culkin raises four issues. In our review, we defer to the factual findings of the state court and presume them to be correct in the absence of any showing otherwise, *see Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849–50, 74 L.Ed.2d 646 (1983), and we "review the legal conclusions of the lower court de novo," *McDowell v. Leapley,* 984 F.2d 232, 233 (8th Cir.1993).

## II.

Culkin first claims that the trial judge and the prosecuting attorney violated his rights under the Sixth Amendment (compulsory process) and the Fourteenth Amendment (due process), because their "threats and warnings concerning a perjury prosecution" served to "improperly interfere with or intimidate" B.J.B. at the hearing on the motion for a new trial. Brief of Appellant at 8. We consider with this issue Culkin's closely-related second contention on appeal: that the prosecutor's actions in "threatening, intimidating, and coercing [B.J.B.] to invoke her rights under the Fifth Amendment" amounted to prosecutorial misconduct resulting in violations of Culkin's Sixth and Fourteenth Amendment rights. *Id.* at 12.[2] The upshot of Culkin's claims is that the allegedly improper actions of the court and the prosecu-

tor caused B.J.B. to invoke her Fifth Amendment rights, which in turn violated his constitutional rights, and the court then compounded this error by refusing to compel B.J.B. to testify.

■ Culkin's theory would have us conclude that, because B.J.B. invoked her Fifth Amendment rights and refused to recant her earlier testimony, she must have been "intimidated" into doing so by the actions of the prosecutor and the court. But as Culkin himself states, B.J.B. "willingly travelled to St. Louis from Wickless, Kentucky prepared to testify," Brief of Appellant at 12, so it is apparent that nothing the prosecutor or his investigator said up to that point deterred B.J.B. from testifying. Only later, after her colloquy with the trial court and consultation with her appointed counsel, did B.J.B. decline to testify. In these circumstances, we cannot find any merit in Culkin's claim for habeas relief on the basis of asserted prosecutorial misconduct.

■ As for the court's role in "intimidating" B.J.B., we are equally unpersuaded by Culkin's argument. B.J.B., still a preadolescent girl, arrived at the hearing without an attorney to represent her.[3] After she took the stand, the court warned her of the consequences if she perjured herself, and properly so, especially considering that she arrived at the hearing, a minor, unrepresented by counsel, and prepared to testify contrary to testimony she already had given under oath (that is, prepared to open herself to perjury charges). As the transcript reveals, the judge took a decidedly non-threatening approach in warning her of the perils she faced. *Cf. Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam) (reversing petitioner's conviction where trial judge

---

**2.** The state argues that Culkin's prosecutorial misconduct claim was not raised in the District Court and thus "this claim would be an abuse of the writ." Brief of Appellee at 18. Because Culkin's first two claims complain of the same conduct, allegedly violating the same constitutional rights, we believe the first issue subsumes the second and we consider them together.

**3.** Culkin has advised this Court that, "[p]rior to her attempt to testify, [B.J.B.'s] family had spoken with an attorney concerning her recantation." Brief of Appellant at 11–12. As it turns

out, according to the reference to the record that Culkin provides (Supplemental Transcript at 33), Rundles, with her aunt and B.J.B. present, on the day before the hearing, spoke with the attorney representing Culkin—despite the inference one reasonably might draw from Culkin's brief that the family actually consulted with independent counsel. We do not consider the family's having "spoken" with Culkin's attorney even to approach a proper consultation with counsel to advise B.J.B. and protect her interests.

told defense witness that, if he lied under oath, the judge would "personally" see that the perjury case against the witness went to the grand jury, the witness would serve prison time for the perjury, and his parole status would be adversely affected). After informing B.J.B. that there are penalties for perjury, even for juveniles, the judge made it clear that the decision whether to testify at the hearing was B.J.B.'s to make, and that consulting with counsel would be desirable as a measure to assure that her rights would be protected. B.J.B.'s equivocal "I guess" response to the court's question about her wish to testify without consulting counsel (after her mother's peremptory declaration that B.J.B. would be "all right") prompted the court to adjourn the proceeding so that B.J.B. and her mother could consult with the appointed public defender. It was only after consultation with counsel—appointed specifically to represent B.J.B.—that she invoked the Fifth Amendment. Culkin does not suggest that the court erred in appointing counsel to represent B.J.B.'s interests, nor does he suggest that her appointed counsel threatened or intimidated B.J.B. during their meeting or that her appointed counsel's advice was in any way improper. Until the time of B.J.B.'s consultation with her appointed counsel, the warnings she had received had not dissuaded her from proceeding with her testimony. Instead, she changed her course of action and invoked her Fifth Amendment privilege only after consultation with her counsel. In short, we believe that the action of the trial judge was proper and that it affords Culkin no basis for habeas relief.

■ We also disagree with Culkin's assertion that the court should have compelled B.J.B. to testify after she invoked the privilege (although how the court could have done this is not explained), which would have entailed a determination that Culkin's alleged constitutional rights trumped B.J.B.'s Fifth Amendment rights. In the alternative, Culkin argues, the court should have stricken all of the testimony B.J.B. gave during the jury trial.[4]

■ Culkin argues that, because the court allowed B.J.B. to invoke her Fifth Amendment rights and to refuse to testify (assuming the rather dubious proposition that there was some way the court might have forced her to testify), he was deprived of the right to "test the truth" of her testimony. We disagree. We concur with the Fifth Circuit's conclusion that when a defendant's Sixth Amendment rights and a witness's Fifth Amendment rights collide, "an accused's right to compulsory process must give way to the witness' Fifth Amendment privilege not to give testimony that would tend to incriminate him." *United States v. Boyett,* 923 F.2d 378, 379 (5th Cir.) (quoting *United States v. Khan,* 728 F.2d 676, 678 (5th Cir.1984)), *cert. denied,* 502 U.S. 809, 112 S.Ct. 53, 116 L.Ed.2d 30 (1991). Moreover, in this case the trial court expressed its skepticism that it would have granted Culkin's request for a new trial even if B.J.B. had testified at the hearing in accordance with the statements made in her affidavit:

> [T]he burden on a defendant seeking to overturn a conviction on the theory of newly discovered evidence, particularly based on the recantation of a prosecuting witness's testimony, is at least, in my judgment is a heavy one, and I am not altogether sure that even if [B.J.B.] were to go ahead and testify and to recant consistent with the affidavit filed herein, that that would carry the burden of the defendant, because I think that if it comes down to at what point in time was a particular witness telling the truth, absent extrinsic evidence, that is, evidence outside the testimony of that particular witness, I find it very, very difficult to believe that the Court would be justified in overturning the conviction because the jury observed [B.J.B.] at trial, the jury had a great deal of evidence as to statements that were made by her and I think that even then there was some evidence that she had recanted at one point....

Supplementary Transcript at 52; *see also id.* at 122 ("[W]hen you have a case like this, Mr.

---

**4.** There is no indication that Culkin at any time asked the trial court to strike B.J.B.'s trial testimony.

Culkin, when the witness comes back and says she didn't mean it, seldom, if ever, is that going to cut it.")

■ We further hold that the trial court did not err in allowing B.J.B.'s trial testimony to stand, keeping in mind that the court would have had to act *sua sponte* to strike it. *See supra* note 4. Culkin had ample opportunity to "test the truth" of B.J.B.'s trial testimony and to impeach her credibility during both his cross-examination and his case in chief. *Cf. United States v. Doddington,* 822 F.2d 818, 822 (8th Cir.1987) (holding that federal trial court properly struck defense witness's direct testimony without violating the accused's Sixth Amendment rights where witness invoked the Fifth Amendment on the government's cross-examination, concluding that his direct testimony became "hearsay since it was not subject to cross examination"). The jurors chose to credit B.J.B.'s testimony and they convicted Culkin. The long-after-the-fact affidavits of B.J.B. and her mother, the so-called "newly discovered evidence," do not by themselves give Culkin any right to examine B.J.B. further, especially when the prosecutor had not questioned B.J.B. under oath since the trial and did not cross-examine her on the statements made in her affidavit. At the time of the hearing, with no further testimony against him having been elicited since his conviction, Culkin had no· constitutional rights—either to compel process or to confront witnesses—that went unprotected by the court.

In sum, we hold that neither the prosecutor nor the trial court violated Culkin's Sixth Amendment or Fourteenth Amendment rights.

### III.

■ Culkin contends that he was entitled to an evidentiary hearing in the District Court on his § 2254 petition. We disagree. "[I]f a petitioner received a fair hearing in state court and the dispute can be resolved based on the record," then a district court properly may dismiss a § 2254 petition with-

out a hearing. *Chandler v. Armontrout,* 940 F.2d 363, 366 (8th Cir.1991). If, however, a "petitioner alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing," then he is entitled to a hearing in federal court. *Wilson v. Kemna,* 12 F.3d 145, 146 (8th Cir.1994) (per curiam) (internal quotation marks omitted).

The District Court properly concluded that an evidentiary hearing on Culkin's petition was unnecessary. Culkin seeks a hearing only on the question whether "the trial court and prosecutor improperly intimidated [B.J.B.] into invoking the privilege." Brief of Appellant at 20, *quoted in* Appellant's Reply Brief at 6. Apparently, it is the hearing on Culkin's motion for a new trial that Culkin challenges as falling short of "full and fair," and not the state court postconviction proceedings. In any event, we think that the record in this case irrefutably establishes that Culkin's claim is without merit, and therefore no federal court hearing is required. *See Wilson v. Kemna,* 12 F.3d at 146. The record is clear that B.J.B. was prepared to testify until she met with counsel appointed to represent her best interests. In these circumstances, any evidence not already in the record that Culkin may have proffered to show that B.J.B. had been intimidated by the prosecutor or the court would not have resulted in the finding of a constitutional violation—since B.J.B. was prepared to testify and did not assert her Fifth Amendment privilege until after she consulted with her counsel and received his advice.

The District Court did not err in refusing to hold an evidentiary hearing on the question of intimidation.

### IV.

■ Finally Culkin contends that the District Court erred in concluding that the trial court properly refused to grant a mistrial, which Culkin sought on the grounds that the prosecutor made inflammatory remarks during closing argument. The comments at issue are these[5]:

them in general terms and refers to pages of the trial transcript. We quote the passages that Culkin principally relies upon, that is, the portions

---

5. Culkin's brief on appeal does not quote the allegedly offending passages from the prosecutor's closing argument, but merely describes

And I offer you his alibi, short trip. Honest people don't need alibis.

Transcript at 669.

He could have satisfied his desires most any place else, right, but he chose because of his preference, because of his nature, because of his proclivity, because of his perversion, he chose a little girl.

*Id.* at 675. No objection was made to this remark.

You know, he talked about that this guy, his character is honest and this, that and the other thing. Got up there and was honest, and his people said he was honest and a nice guy. What's that mean? Does that tell you he didn't do it? Does that really show you anything in this case?

I think we remember family names, like John Wayne Gacy, who got his picture taken with the President. What did they do, find twenty-two boys' bodies underneath his house.

*Id.* at 676–77.

It may be that the prosecutor's comments push the limits of zealous advocacy. *See Culkin*, 791 S.W.2d at 813 (stating that prosecutor's reference to Gacy "is hardly a shining example of proper closing argument"). We have reviewed the record in its entirety, however, and have considered the overall fairness of the trial, and we do not think that the comments at issue rendered Culkin's trial fundamentally unfair so as to offend his due process rights. *See Logan v. Lockhart*, 994 F.2d 1324, 1330 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 722, 126 L.Ed.2d 686 (1994). Any error that may have occurred was not so "gross, conspicuously prejudicial or of such import that the trial was fatally infected." *Id.* at 1329 (quoting *Rhodes v. Foster*, 682 F.2d 711, 714 (8th Cir.1982)). The trial court reminded the jury, after the objection to the comment about alibis, of the court's previous instruction regarding the difference between evidence and argument, and we credit the jurors with the sense to separate the prosecutor's hyperbole from the evidence in the case.

Even taken together, the remarks Culkin complains of do not amount to a due process violation requiring a new trial.

## V.

The judgment of the District Court dismissing Culkin's § 2254 petition is affirmed.

of the argument quoted in the Magistrate Judge's Report and Recommendation. We also have considered the prosecutor's arguments that appear on the pages cited in Culkin's brief but that are not contained within the passages we quote, and we conclude that all of the allegedly offending passages taken together fail to add up to a basis for habeas relief.